May it please the court, Gregory Murphy, Federal Defenders, Mr. George Waw. Your Honors, in a three-week period in the summer of 2009, seven people were prosecuted for misdemeanor illegal entry. Six Mexican nationals were permitted to plead guilty and received time-served sentences at their initial appearance. Mr. Waw, who is Syrian, was not given that opportunity. Why is that irrational? We have somebody sneaking in from a country that has hostile relations with the United States. Why would it be irrational for the government, if they did in fact treat him differently, to hold off to make sure they knew who they were dealing with before they gave him a regular time-served deal? Your Honor, I guess there are maybe three responses. First, I don't think the factual record before the court supports that that's what was happening. Mr. Waw was offered... No, I'm asking you, why couldn't they do that? Why can't they say, you know, people who sneak in from Mexico were not as worried about as in this post-11 era people who sneak in from Syria? Nationality is a favored classification. That is, discrimination based on national origin is subject to strict scrutiny. And I agree with the court that, well, I think we would be in a different situation if this were an immigration proceeding. I think there are some contexts where the executives' control of the borders may warrant particular attention. And that's not the case before us. I'm not prepared to really discuss it. This is talking about an application of the criminal laws of the United States. And when the government decides how to prosecute people, decides how much time the people should get based on their national origin, that raises equal protection concerns. And so if they're going to choose to do it, they have to do it in a way that passes heightened scrutiny, that is particularly tailored to address the particular problem that they identify as needing to be addressed. Do I understand correctly? Excuse me. They offered your client a plea bargain, what, 46, 43 days into the process. Is that right? The original plea bargain was offered two days after I was appointed and four days after his arrest. What stopped you from just pleading straight up? I certainly could have pled straight up. Your Honor, the one thing that is not clear, candidly, in my briefs, is that our concern is really not about the plea agreement that was offered four days after his arrest or two days afterwards. What we're concerned about is this exception of Mr. Wah from this month-long policy of offering time-served sentences at the initial appearance. And for practical reasons, it was impossible for Mr. Wah to obtain to plead straight up at his initial appearance. Among other things, Mr. Lesowitz, the prosecutor, was not assigned to the case. Mr. I was not assigned to the case. He arrived on his initial appearance, as did the six Mexican nationals who received favor treatment without an attorney, with a complaint filed, under circumstances in which, as the Court may know, our office is a training office, somewhat unusual in comparison to other federal defender offices. It's staffed by our newest attorneys and by the newest attorneys for the prosecution. And there is no opportunity for either of those people to exercise any discretion. There is not possible for our attorneys to plead someone straight up, for example, as the Court is asking, at their initial appearance. Because why? Well, among other things, we don't know the clients in any meaningful way. It's not impossible to just choose not to for whatever reason. You could if you wanted to. Well, we don't know, for example, whether we'll be appointed until we're in court. We usually don't have an opportunity to. We won't have a second opportunity to interview them once we're in court. We won't have an opportunity to evaluate with them what they choose to do, what their circumstances are. It's simply, you know, if the prosecution comes in and says these people Well, if you don't know too much about them, why is the government required to treat them as though they're just a common Mexican alien who sneaks across the border? Your Honor, I don't suggest that the government is required to offer time-served misdemeanor deals to people at initial arraignments, Mexicans or Syrians or folk of any variety. What I am suggesting is that during this time, the practice was to offer time-served initial appearance pleas and immediate sentences. And that for reasons that have never been explained, Mr. Waugh was exempted from this. And the six people who received this deal had aggravated criminal histories, were more aggravated than Mr. Waugh's, aggravated immigration histories. The only distinguishing factor that has ever been suggested warrants additional time for Mr. Waugh is his nationality. That he's from a country that's on the terrorist watch list. He was born in a country that is on the terrorist watch list. But there has never been any suggestion that Mr. Waugh himself is a terrorist. Let me add another element then. He's from a country that's 10,000 miles away. And so he's built up a real head of steam to get to that border. It has to be presumed that his motivation to cross the border is high. He's not somebody who could possibly be from the surrounding area. And so if you're looking at deterrence, what's it going to take to deter somebody from trying to re-enter again? You've got somebody who's come 10,000 miles to do it. So chances are pretty good he's going to do it again if all you do is bounce him back to the other side. It seems to me that's another perfectly rational reason for the government or for the court to say, look, I've got somebody here that needs a little more than the usual sentence in order to be deterred from coming back again. What would be wrong with that rationale? I think, I don't, first of all, Your Honor, obviously it's much more difficult for Mr. Waugh to come to the United States. It's likely that being exposed... Well, you think if he's come 10,000 miles, and I'm guessing, I didn't look it up, but he's come quite a distance to get to that border. You think he's going to be deterred from trying again if he's given a time-served sentence? If he serves four days? I don't think so. If I'm a judge, I say, gee, if I want to keep this guy from coming back again, I'm going to have to get his attention right away. I can't treat him like the people that live in Guadalajara or whatever for whom this isn't such a substantial effort. I don't know that their head of steam is going to be anything like Mr. Waugh's. What's wrong with that distinction? I guess I disagree with the court that Mr. Waugh wouldn't have been deterred or that someone who comes along... Why would you expect someone who's come 10,000 miles across that border to be deterred by a four-day time-served sentence? I guess primarily because someone who travels that long and spends that kind of effort to fail so dramatically, to be arrested and imprisoned and rejected, likely experiences the rejection more seriously than someone for whom the reentry is simply a matter of returning, walking a short distance across the border. But I guess the second concern I have is the general proposition that it's appropriate to select people within this period of time for higher sentences because of their nationality. Well, if nationality is a placeholder for effort expended to get to the border and likely motivation to try again, which I think it is, now you may fairly ask, OK, take somebody else who's 10,000 miles away. Suppose somebody shows up from Niger. How's that person going to be treated? Suppose somebody shows up from Cambodia. How's that person going to be treated? Or southern Mexico, Your Honor, or Guatemala, or some part of Canada. See, the comparison you offered doesn't speak to any of that. You've told us, are these the only seven people who were charged with this offense during this period of time? Yes, Your Honor. To the best of my knowledge, there were only seven people. And were they all handled by the same prosecutor? This is an important distinction that was not made clear in my papers. I do not know who made the policy decision in this time. Well, let me ask the question in a different way. Do you have any evidence in the record that this particular AUSA ever offered a plea deal to any of these 1325 defendants that was less than 60 days? No, Your Honor. And if that's the case, then isn't that pretty strong evidence that there's no discrimination in the charging or plea offer decision that was made in this case? I don't believe so, Your Honor. So if he offered the same deal to every 1325 defendant, you would still say that was evidence of discrimination? I don't believe there's evidence of discrimination, in particular by the prosecutor. What I think is that I'm concerned not with Mr. Lesley. You're attacking the policy, as I understand it, of the office. I interrupted the court. But what I'm concerned about is this policy of offering time-served, initial-appearance pleas, which are very unusual on district and happened in a particular time period before Mr. Lesley was involved, before I was involved in the case, for which Mr. Wah was exempted for reasons that are unclear and have never been explained. And so you want the third branch of government to tell the executive branch that your charging decision or your plea offer decision is illegal and constitutional? Is that what you're asking us to do? I'm asking the court, as a fundamental matter, to conclude that I have offered sufficient evidence to make a credible showing of different treatment of similarly situated people distinguished by national origin. But you just told me that the prosecutor offered the same. There's no evidence that he didn't offer the same deal to everybody else. So where is the evidence of discrimination, if that's true? Your Honor, I've run out of time. Let's finish your answer to Judge Talman and then wrap up. Again, Your Honor, my concern is not with the plea offer that Mr. Lesley was made in this case. My concern is with the policy that preceded Mr. Lesley's involvement, in which a number of people were offered initial appearance, time served plea agreements, and Mr. Wah, for reasons that are unclear, was not. Thank you. Thank you. I may please the court. Scott Lesowitz on behalf of the United States. I'd like to start off with one point, and then I will address some of the points Mr. Murphy made. First off, I'd like to make it clear that the magistrate judge actually did find specifically on page 46 of the excerpts of record that the defendant failed to make a prima facie showing in this case because the defendant did not offer evidence of discriminatory intent in his proffer on the issue of to make a prima facie case. She noted and found that the only evidence he presented on the issue of discriminatory intent was statements made by the arresting agent in an interview of another defendant in a different case. She correctly found, citing United States v. Green, a case directly on point, that we need to be looking at the decision of the U.S. Attorney's Office, not anything involving an agent. The inquiry is on the U.S. Attorney's Office, not on the Department of Homeland Security. And that was the only evidence ever proffered on the issue of discriminatory intent, and clearly in order to make a prima facie showing for a case of selective plea negotiation. Is it the case that an offer of time served, which I think was four days at that point, was made at the initial appearance to all of the other people appearing for that charge other than Mr. Waugh? That's not in dispute. I have no reason to doubt that. Well, given that, what other explanation is there for Mr. Waugh being treated differently? And how can that not qualify at least as prima facie evidence of discrimination if there's not another explanation? Well, first of all, I would note that the magistrate's findings, this is an issue of fact, so it would only be overturned if it's clear error. And that's why I'm posing the question to you, because I'm baffled as to how. I mean, she's cutting out the agent's statement and saying, without that, there's nothing. But I'm still staring at, okay, you've got these six guys who were given an offer and one guy who wasn't. And on the surface, the only thing different about the one guy is his nationality. In most contexts, that's at least the first step in showing discrimination. As to what happened at the initial hearing, I wasn't there. As Mr. Murphy said, I wasn't doing new complaints that week, and I did not make the offer in those other six cases. As I stated in my papers both below and here, every single 1325 straight misdemeanor case like this, I offered 60 days. That was my standard offer. I also want to note that this theory on focusing on that initial four-day period before I was assigned was never addressed below by Mr. Murphy. This is something completely new on appeal. This is a completely new argument for the first time. Well, at least these seven people we've heard about before. I confess that you guys know so much about this, you shouldn't assume that we have the background that you have. All I know about are the six Mexicans and Mr. Wah. And frankly, that strikes me as an astonishingly small pool to draw inferences from. But okay, so that's our pool, and apparently they're the only seven who showed up during that day or week. And the only distinction that's been identified so far is nationality. In any other context, employment discrimination, Batson, all those kind of places where we have this multi-step process, that would have no difficulty getting past the first step, which in this context is prima facie evidence of discrimination, unless there's some other explanation offered. Now, I can think of some good ones. I've offered up some. Judge Silverman's offered up some. But the government's been strangely reluctant to say that it made a conscious decision to treat him differently, perhaps because you're not sure why it was treated differently. But if we don't have any evidence of intent counter to six were given the offer and one wasn't, I'm not sure how it can be fairly concluded there is not at least a prima facie evidence of discrimination. Yeah, I would give a few points on this. One, it was my position below that because no prima facie showing was made, the United States was under no obligation to explain itself. Case law is clear on that. However, in terms of making an explanation, my understanding, and this is somewhat based on just my understanding of what happened earlier before I was assigned to the case, was that there was concern that two Syrians who came across the world attempted to enter the United States with a known Mexican foot guide. Somehow he hooked up with them, attempted to enter the port of entry without inspection. They basically tried to cut through the lanes so that the CBP would not notice that they had entered without inspection, and that after they were caught, they did not apply for asylum. We had no idea who they were. We had no idea if they were on any type of FBI watch list. We had no idea what they were, why they were here. The one thing I will note, though, is that in the initial papers that Mr. Murphy filed, he was trying to raise the specter of this is a case of discrimination because this is a Syrian Muslim and they're blanket racial profiling. Then in his later papers, he conceded that his client is actually a Christian, and it was no secret to any of us that the defendants were likely Christian because the first time I opened the file, I noticed the photographs they took of them post-arrest. I noted this in my papers below. The first pictures I see, the defendants had Christian tattoos all over their bodies. They had crosses, Jesus. The specter that somehow this was a discrimination because we want to send a message to these Sunni Muslims that we're going to treat them harshly really doesn't make sense. I said my understanding is that basically there was concern about who these people were because usually what happens is in these situations from countries like Syria that people oftentimes apply for asylum, usually they apply for asylum or they'll talk. Both of these people invoked their Miranda rights. They did not give a statement. We had no idea who they were, why they were here, and it was very alarming that they did not apply for asylum after they were caught. They just remained quiet. Later on, after the proceedings, both of them did apply for asylum. It probably was just a mistake on the foot guy's part to tell them, hey, if you get caught, make sure you apply for asylum. It probably was just a bad foot guy. I thought everybody applied for asylum. That was part of the concern. Why are these two individuals not applying for asylum? I can tell you, though, by the time I got the case, which was not that far after the arrest, that I made the initial offer to Mr. Murphy. Every single case I've done like this, I made a 60-day offer. I believed at the time that that was the standard offer for office for this type of case. That's why I made the offer. Whether it was a Mexican defendant or a Syrian defendant, I thought the standard offer in a legal entry misdemeanor case was 60 days, and as I've shown in every other case I had, that's what I offered. I had no idea these other six defendants were even prosecuted that week and given this deal. I later found out the only reason that happened was there was some issue at our local jail. There was a quarantine because of chicken pox, so we needed to move them out of jail quickly. Is there an office policy, or does each lawyer make his own policy? See, it was my understanding that the standard offer was 60 days. Standard for the whole office? Yes, I thought that was the standard offer, and I showed other AUSAs made that offer too. Do you now understand that? I'm trying to understand. Is it true that every lawyer can make up his own policy, or does the office have a policy? I'm unclear what the policy is now, but usually plea offers are controlled by supervisors, at least to a certain degree. It's my understanding now that we've loosened our plea offers to 1325 misdemeanor defendants, but at the time I said, and this really is an issue of discriminatory intent, and my understanding was 60 days was the normal offer. It was just something weird quirk because the jail was overcrowded. And I also want to note, by the time I got the case, the defendant had already filed a motion for discovery. So it seems to me that this case was going to be litigated right off the bat. I mean, by the time it was assigned to me, which wasn't that far after arrest, he already had on file a motion for discovery for his selective prosecution claim, and at that point he was different than the other six defendants because they pled guilty immediately. And one thing, just quickly kind of going through some of his points, there's no reason he could not plead guilty at the initial appearance straight up because the other six defendants apparently did, so why couldn't he? Apparently there was no barrier for the other six defendants pleading guilty at the first hearing. The theory I understood was that they were offered time served, so plead guilty now and you walk. But I mean, the problem is that this isn't an issue of a charge bargain. This isn't an issue of playing with the statutory maximums. This is a misdemeanor. The guidelines did not apply. What the government recommends is not a 3553A factor. We all know that, but Waugh doesn't know that because it's his initial appearance, and he hadn't talked to a lawyer yet. He would have talked to a lawyer. At that time. Yeah. And what I'm hearing is that at that time what the lawyer sees is everybody else being offered time served and he's not. So he could make the judgment, well, I could plead straight up, but God knows, from a lawyer's perspective I sort of understand I'd be reluctant to recommend to a client at that time, go ahead, plead guilty, take your chances, without knowing what is in his background that might surface. Well, I would argue that, first of all, he could present the evidence of the six other defendants to the judge, who likely would go along with it. And second of all, I also think that the issue here also is just the redondolemus test. We need to fall back on that. First of all, these motions for selective prosecution, especially in the plea agreement context, are very highly disfavored. And the fact was Mr. Murphy acknowledges in his papers that I made a time served offer well before actually the sentencing. I initially made the 60-day offer. Then at a motion hearing that was based on the records, it seems like it was about halfway through the proceedings, probably about three weeks in, I offered time served at that point. So the fact was he wanted time served and he got time served pretty quickly. And to give a remedy that's highly disfavored by redondolemus and dismiss, I think, would be highly, highly inappropriate. Thank you very much, Mr. Leslie. Thank you. Mr. Murphy, you used up your time, but we'll give you a minute in rebuttal. Thank you. Thank you, then, gentlemen. The case just argued is submitted. Thank you. Next case before we take our break, then, will be United States v. De La Porta, 10-50168. Each side will have ten minutes.
judges: Silverman, Tallman, Clifton